IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEREMY CLARK,                                          OPINION AND ORDER

        Plaintiff,                                 15-cv-333-bbc

        v.

JERRY SWEENEY, JONI SHANNON-SHARPE,
SHIRLEY GATES, CARRIE SUTTER, KELSEY
LUND, LORI ALSUM, WILLIAM BROWN,
LEO HAMMER, ANTHONY BROADBENT,
WELCOME ROSE and GARY BOUGHTON,

        Defendants.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Pro se prisoner Jeremy Clark filed this civil lawsuit against various prison officials at the Wisconsin Secure Program Facility, alleging that they violated his Eighth Amendment rights by refusing his request for special shoes he says he needs to treat his painful foot condition.  Defendants have filed a motion for summary judgment, which I am granting because I conclude that plaintiff has not presented sufficient evidence from which a reasonable jury could find that any of the defendants violated his Eighth Amendment rights.  The undisputed facts show that defendants did not ignore plaintiff's foot condition and did

---

[1] This is the current case caption, showing the full names of each of the eleven defendants who are still parties to this lawsuit.

not knowingly subject him to a substantial risk of serious harm or to needless pain when they denied his requests to order special personal shoes from non-approved outside vendors. Defendants are entitled to judgment as a matter of law and plaintiff's claims will be dismissed with prejudice.

I note from the parties' submissions that plaintiff provided no response to many (more than half) of defendants' proposed findings of fact.  See generally dkt. ##46, 52.  I have treated the unanswered proposed findings as undisputed.  Preliminary Pretrial Conference Order (entered October 17, 2015), dkt. #17, ("A fact properly proposed by one side will be accepted by the court as undisputed unless the other side properly responds to the proposed fact and establishes that it is in dispute.").  From the parties' proposed findings and evidence on the record, I find that the following facts are material and not subject to genuine dispute.

## UNDISPUTED FACTS

### A.  Plaintiff's Foot Condition and Initial Prison Treatment

Plaintiff Jeremy Clark is an inmate in the custody of the Wisconsin Department of Corrections.  At all times relevant to this lawsuit, plaintiff was housed at the Wisconsin Secure Program Facility in Boscobel, Wisconsin.  At the time of his transfer to the Boscobel facility on May 16, 2013, plaintiff had no special shoe restrictions, but he suffered from

bunions and hammertoe that caused him pain in his feet.  On May 18, 2013, Dr. Burton Cox of the prison's Health Services Unit wrote plaintiff a prescription for Velcro shoes as an alternative to the regular-issue prison shoes for his bunions and foot pain.

On May 19, 2013, plaintiff submitted a request to the Health Services Unit asking that he be allowed to buy "better shoes to help support [his] knees and ankles."  The following day, a member of the Unit staff responded that plaintiff could order shoes from the approved vendor list.  In accordance with prison property rules, inmates may be allowed to purchase personal shoes, which they can order from the catalogs of approved vendors.  These personal shoes may be worn in place of the regular state-issued footwear or in addition to them.  For security reasons, prison property rules limit inmates to ordering any such items from one of two approved outside vendors.  (In July 2013, in response to a large number of requests from inmates to order athletic shoes from non-approved vendors, prison officials circulated a memorandum to remind all inmates and staff of applicable rules, policies, and procedures regarding the ordering of shoes, including for the treatment of medical conditions.)

On May 23, 2013, plaintiff submitted another request asking that he be allowed to order personal shoes other than those in the approved-vendor catalog.  Staff responded that the Health Services Unit could not approve that request.  Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF, dkt. #52, at ¶¶ 33-38.

3

On August 8, 2013, plaintiff saw Dr. Cox about his bunions and foot pain and complained that the Velcro shoes that he had been prescribed and was wearing were not wide enough.  Dr. Cox noted that plaintiff would need to get new measurements for proper sizing, and that the Health Services Unit might need to obtain a foot measuring tool from elsewhere.  Plaintiff returned to the Unit on October 2, 2013 to have his feet measured.  The measurements showed that plaintiff needed a size 12A shoe for his right foot and a size 12C shoe for his left foot.  Relying on these measurements, the prison's Business Office ordered plaintiff a new pair of Velcro shoes in size 12C to supplement or replace his existing pair of size 12A Velcro shoes.  The new shoes were issued to plaintiff on October 18, 2013.

Plaintiff continued to complain that his shoes did not fit properly and were causing him pain.  On December 2, 2013, Dr. Cox made a request for plaintiff to be seen by a podiatrist at the University of Wisconsin Hospitals and Clinics.  Dr. Cox's request was approved later that month.  (The parties do not say whether any appointment was scheduled or any further action taken at that time.)

On December 18, 2013, plaintiff filed a grievance in which he complained that he should be allowed to order personal shoes from a non-approved vendor because of his bunions and his belief that the shoes he had received after the October sizing were too small. The office of the prison complaint examiner, where defendants William Brown and Welcome Rose worked, investigated plaintiff's grievance by contacting the Health Services

4

Unit.  Unit staff informed the examiner's office that the problem appeared to be that plaintiff's feet were two different sizes:  his right foot was a 12A and his left was a 12C. There was no need for plaintiff to order his own shoes; instead, Unit staff stated, they had contacted the Business Office, which was ordering new shoes for plaintiff.  After receiving this information from the Health Services Unit, the examiner's office dismissed plaintiff's grievance.  Another new pair of shoes was issued to plaintiff on or around February 9, 2014. (The parties do not say whether or how this pair of shoes differed from those that plaintiff had received previously.)

After further complaints of foot pain and requests for new shoes in size 12.5, plaintiff returned to the Health Services Unit to have his feet re-measured on March 15, 2014. Prison health records indicate that on that date plaintiff had both feet measured, and that his right foot measured size 13 and his left foot measured size 12.  However, plaintiff still insisted that he needed to have size 12.5 shoes.  The Health Services Unit did not have any shoes in size 12.5, and plaintiff was offered a new pair of size 13 shoes, but refused them, electing to keep his size 12 shoes instead, even though they appeared to be too small. Plaintiff generally disputes "[t]hat his feet measured at 12 and one 13, they were both 12 ½ EE that's why [plaintiff] insisted on the 12 ½ EE," but he does not cite any evidence to support that statement and he does he not allege specifically that prison officials' account of events and measurements is inaccurate.  Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF, dkt.

5

#52, at ¶¶ 41-42; Waterman Decl. Ex. 118, dkt. #42-1, at 16-17, 55.

B. <u>The Special Needs Committee's Response to Plaintiff's Requests</u>

At some point prior to April 18, 2014, plaintiff submitted a request to the prison's Special Needs Committee that he be allowed to purchase personal shoes from a non-approved outside vendor.  (Neither side has submitted a copy of plaintiff's request or summarized his request with any specificity or identified the date on which it was submitted.)

The Special Needs Committee is a group of prison officials whose members include health, administrative, security and other prison staff and are appointed by the warden.  The committee meets monthly to determine whether an inmate requires a medical restriction or has a special need based on a medical necessity.  Membership changes, but the following defendants served on the committee at times relevant to this case: Security Director Jerry Sweeney, Supervising Officer Joni Shannon-Sharpe, Human Resources Director Shirley Gates, Financial Program Supervisor Carrie Sutter, Nurse Kelsey Lund and Nurse Leo Hammer.

On April 18, 2014, the members of the Special Needs Committee (who at the time were defendants Sweeney, Shannon-Sharpe, Gates, Sutter and Lund) notified plaintiff that his request would be denied.  (They did not provide a reason for the denial, but the record

suggests that the committee reviewed plaintiff's health records described above on April 18, 2014.)   The committee advised plaintiff to order any personal shoes from one of the approved vendors.   At that time, the prison allowed two different vendor catalogs that included several different shoe options, styles, and sizes—including sizes 12, 13 and 14, and some wide and extra-wide options.

On April 17, 2014, plaintiff was approved for a visit to an outside podiatrist to examine his feet and make recommendations.  (The parties do not say why plaintiff was not taken to see a podiatrist more quickly, after the earlier request that had been submitted by Dr. Cox and apparently approved in December 2013.)  On May 2, 2014, plaintiff was seen by Dr. Jill Migon, a podiatrist at the University of Wisconsin Hospital and Clinics.  Dr. Migon's notes indicated that Dr. Cox had asked her for a consultation on plaintiff's bunions and hammertoes.   In her recommendation, Dr. Migon stated that plaintiff needed size 12.5EE wide shoes, and wrote: "Please allow him to purchase personal shoes from an outside vendor other than institutional catalog.  This should avoid surgery."  Dkt. #42-1, at 42.  Dr. Migon also noted that plaintiff's feet had been bothering him for approximately 13 years and that he had been taking several medications for pain.  She added that the prison had size 12 or 13 shoes in triple wide, but recommended that plaintiff be allowed to wear size 12.5 double wide, citing plaintiff's own concern that he "be able to purchase a pair of shoes that are 12.5EE as he feels that this would significantly help his foot pain.  Currently, he is in the

institution shoes that are slightly too wide and he feels fit inappropriately." Id. at 44. Therefore, Dr. Migon found, "it is appropriate for him to be able to purchase a pair of personal shoes from an outside vendor other than the institution catalog for him to have a bigger selection." Id.; Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF, dkt. #52, at ¶¶ 46-50. (Other than plaintiff's stated preference, Dr. Migon did not provide a reason why she was recommending size 12.5EE shoes.)

On May 23, 2014, plaintiff filed another grievance in which he complained that prison officials were not complying with Dr. Migon's recommendation. Plaintiff also noted that the approved vendors did not carry size 12.5EE shoes, and that he therefore could not obtain his proper size from an approved vendor. The examiner's office rejected plaintiff's grievance, but forwarded a copy to the Special Needs Committee for consideration. Plaintiff also appealed the examiner's decision and it was reviewed by defendant Lori Alsum, a Health Services Nursing Coordinator with the Department of Corrections Bureau of Health Services. Defendant Alsum reversed the examiner's decision and affirmed plaintiff's grievance. She concluded that the prison had an obligation to provide plaintiff a proper-sized shoe, which, according Dr. Migon, was a size 12.5EE. However, defendant Alsum noted, that the recommendation did not necessarily mean that plaintiff was entitled to order extra personal shoes from a non-approved outside vendor. (The parties do not say what, if anything, happened in response to defendant Alsum's decision.)

On May 29, 2014, plaintiff again saw Dr. Cox, who noted that the Special Needs Committee would be reviewing plaintiff's renewed request to order shoes from a non-approved outside vendor.  On June 3, 2014, the committee (now made up of defendants Sweeney, Gates, Sutter, Shannon-Sharpe and Hammer) met again to discuss plaintiff's request.  The committee denied plaintiff's request to purchase shoes from a non-approved vendor (again, without providing a reason), and informed plaintiff that the Health Services Unit would provide him appropriately-sized shoes.

Following the committee's decision, prison officials attempted to find size 12.5EE shoes for plaintiff, but the prison's usual vendors carried shoes in half sizes only up to size 11.  In an effort to find the appropriate size, the Business Office ordered shoes in sizes 12EE, 12EEE, 13E and 13EE.  Plaintiff refused all of these shoes without trying them on, because they were not the size 12.5 that he believed he needed.

On July 14, 2014 Health Services Manager Jolinda Waterman received a fax message from Dr. Migon stating that plaintiff "can wear a size 13 shoe."  Dkt. #42-1, at 43.  Plaintiff was shown a copy of Dr. Migon's fax message, and after initially objecting and refusing to wear a size 13 or any of the new shoes that had been ordered for him, he eventually agreed at sometime between July 16 and July 18, 2014 to accept and wear the new size 13EE shoes.

C.  Plaintiff's Subsequent Grievances and the Prison's Response

On July 14, 2014, plaintiff submitted a grievance in which he alleged that the pain medications and palliative care he was receiving from the Health Services Unit for his bunions were not effective.  This grievance was denied because he was receiving varied and ongoing treatment at that time.  The examiner noted that plaintiff had been given a number of pain medications, including naproxen, ketoprofin and melaxicam, and had also been seen by an outside podiatrist who was considering whether surgery might be necessary.

Also on July 14, 2014, defendant and prison warden Gary Boughton received a copy of plaintiff's earlier grievance of May 23, 2014.  Over the next few days, defendant Boughton exchanged emails with Waterman and defendants Broadbent and Sutter, inquiring about the handling of plaintiff's concerns about his shoes.  Sutter first told Boughton that plaintiff had recently been provided shoes in sizes 12EE, 12EEE, 13E, and 13EE, but that he had refused them all, and that staff was searching for a shoe option and size that would fit him properly and also meet prison security guidelines.  On July 15, Waterman told Boughton that the outside podiatrist had confirmed that plaintiff could wear a size 13.  On July 16, Sutter told Boughton that plaintiff had agreed to wear the size 13 shoes he had been given.

On July 21, 2014, plaintiff submitted another grievance in which he complained that the approved vendors that sold personal shoes to inmates did not have a wide enough selection of shoes to "accommodate [his] size and comfort needs."  Plaintiff acknowledged

that the approved vendors offered shoes in size 13EE, but he complained that the approved vendors did not have "athletic type shoes" in this size. The examiner's office denied plaintiff's grievance because he had been provided proper-fitting shoes that met his medical needs. On August 22, 2014, defendant Boughton reviewed plaintiff's appeal of that decision, and found that the grievance was appropriately rejected.

On October 1, 2014, plaintiff had a follow-up appointment with a different podiatrist at the University of Wisconsin Hospitals and Clinics for an appointment. Dr. Smith saw plaintiff and recommended sending him to Aljan Co. to be fitted for supportive athletic shoes (extra depth, extra width) and custom orthotics. He also noted that plaintiff should be treated with pain medications as needed. Finally, Dr. Smith noted that an "injection may be needed in the future" and that surgery should be considered only if all other more conservative measures fail.

The Health Services Unit made an appointment for plaintiff to be fitted for custom shoes and orthotics at Aljan Co. on December 22, 2014, but plaintiff saw Dr. Smith again about his bunions five days before the scheduled fitting. (The parties do not say why this appointment was scheduled at this time.) Dr. Smith noted that plaintiff was complaining about significant foot pain and that he had not yet received new custom shoes or orthotics. Dr. Smith also noted that there was little she could do for plaintiff at that point. She would not consider surgery until plaintiff had tried the custom shoes and orthotics and exhausted

11

all other more conservative treatment options.  On December 22, 2014, plaintiff saw Dr. Alan Burke at Aljan Co.  Dr. Burke examined plaintiff and measured his feet, and then ordered him custom shoes and orthotics.

On January 22, 2015, plaintiff wrote to defendant Boughton to complain about not being allowed to order shoes from a non-approved outside vendor.  (The parties do not provide a copy of that letter or describe its contents any more specifically.)  Defendant Boughton responded on January 27, outlining his position and the prison's policy with respect to special medical needs and the ordering of personal shoes.  He also noted that plaintiff was still waiting to receive the "custom orthotics and supportive athletic shoes (extra depth, extra width)" that had recently been ordered from Aljan.  Boughton Decl., Ex. 104, Dkt #34-5.

On March 1, 2015, plaintiff filed a new grievance about the delay in receiving his custom shoes and orthotics from Aljan.  He also complained that he was not being given options to care for himself.  Specifically, he renewed his request that the prison allow him to purchase his own shoes from any vendor he liked if he believed that those shoes would fit him better.  Plaintiff argued that these were "extenuating circumstances" and that the prison's policy of limiting inmates to purchasing their personal shoes from approved vendors should be waived in his case.  The examiner's office denied this grievance.  Prison staff contacted Aljan, which responded that it was backed up with appointments and orders, but

12

that plaintiff's custom shoes and orthotics were in the process of being made.

On March 12, 2015, plaintiff sent another letter to the warden complaining that he had been dealing with significant and debilitating pain in his feet and knees for two years, that he had tried everything and had still not received appropriate shoes as he had requested, and that he was still waiting for his custom shoes and orthotics from Aljan to arrive.  Clark Compl., Ex. 36, Dkt. #1-36.  On March 20, defendant Boughton sent a brief reply stating that Ms. Waterman had contacted Aljan to check on the status of the custom shoe order, that the shoes were "in the fabrication stage" and that once they were ready, plaintiff would have another appointment at Aljan to receive them.  Defendant Boughton also told plaintiff that his "request to have [the Health Services Unit] issue a restriction allowing you to purchase shoes from an outside vendor has been previously addressed through the Special Needs Committee."  Boughton Decl. Ex. 105, Dkt. #34-6; Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF, dkt. #52, ¶¶ 73-86.

On April 20, 2015, plaintiff returned to Aljan for a follow-up appointment, at which time Dr. Burke gave him his custom shoes and orthotics.

OPINION

A.  Scope of the Case

Before beginning my legal analysis, a few observations and clarifications are necessary

13

regarding the proper scope of plaintiff's claims against the different defendants with respect to both the relevant time period and the factual basis of the claims.

Although plaintiff's complaint contained no reference to events after April 20, 2015, his summary judgment materials suggest that his foot problems continued, and that he has further grievances with respect to prison officials' handling of his foot condition. Notably, plaintiff's proposed findings of fact include various new allegations relating to events in August 2015 or later (with some continuing well into 2016). However, all of these allegations post-date the complaint (filed June 1, 2015) and, because plaintiff did not move for leave to amend or supplement his complaint, they cannot be considered at this time and in this lawsuit. Even if plaintiff were to file such a motion now, it would be denied because the case is now too far along for defendants to be able to respond sufficiently to new allegations before trial (currently scheduled for December 5, 2016). Preliminary Pretrial Conference Order (entered October 17, 2015), dkt. #17.

With respect to the proper factual scope of his Eighth Amendment claims relating to his treatment before August 2015, plaintiff complains of a broad series of actions taken by various (and sometimes unspecified) individual or groups of prison officials. E.g., Plt.'s Opp. Br., dkt. #45, at 2-5. I granted plaintiff leave to proceed at the outset of this case, but limited the scope of the case to plaintiff's claims that eleven particular prison officials "violated his rights under the Eighth Amendment by not allowing him to order medically-

14

prescribed shoes from a non-approved vendor." Dkt. #10, at 13. Therefore, to the extent plaintiff is challenging any decisions or actions other than those individuals' denials of his requests to order shoes from an unapproved vendor, his challenges are outside the scope of this case.

Plaintiff also concedes in his response to defendants' motion for summary judgment that he cannot succeed on his claims against defendants Alsum, Brown, Rose and Unit Manager Anthony Broadbent. Plt.'s Opp. Br., dkt. #45, at 7-8. Accordingly, I am dismissing plaintiff's claims against these four defendants and will consider only plaintiff's claims against the remaining seven defendants: the six named members of the Special Needs Committee (defendants Sweeney, Shannon-Sharpe, Gates, Sutter, Lund and Hammer), and the prison warden (defendant Boughton).

The undisputed facts show that the involvement of the six Special Needs Committee defendants was limited to two discrete decisions: their decisions to deny plaintiff's requests to order personal shoes from a non-approved outside vendor, first on April 18, 2014, and then again on June 3, 2014. Those two decisions will be the focus my analysis of the claims against these defendants. Then I will proceed to address plaintiff's claim against warden Boughton.

15

B. <u>Legal Standard</u>

To defeat defendants' motion for summary judgment, plaintiff must present enough evidence to allow a reasonable jury to find that defendants violated his Eighth Amendment rights by acting with "deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976). Defendants do not deny that plaintiff's bunions and painful foot condition presented serious medical needs, so I need not consider that issue. Thus, the only question to consider and determine on summary judgment is whether plaintiff has submitted enough evidence from which a reasonable jury could conclude that defendants were "deliberately indifferent" to plaintiff's particular medical needs for treating his foot condition.

For a prison official to act (or fail to act) with "deliberate indifference" means that he or she "'knows of and disregards an excessive risk to inmate health or safety.'" <u>Gevas v. McLaughlin</u>, 798 F.3d 475, 480 (7th Cir. 2015) (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994)). "[S]pecifically, he must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." <u>Id.</u> (internal quotation omitted); <u>see also</u> <u>Norfleet v. Webster</u>, 439 F.3d 392, 397 (7th Cir. 2006) (deliberate indifference is "akin to criminal recklessness, which requires that the defendant be aware of and disregard an excessive risk of serious harm to the inmate"). To establish that a course of medical treatment by prison officials demonstrates

16

deliberate indifference, a prisoner must show that the treatment he received was "blatantly inappropriate."  Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014); Greeno v. Daley, 414 F.3d 645, 654 (7th Cir. 2005).

After reviewing the parties' summary judgment materials, I find that there is no genuine dispute as to any material fact and that the undisputed facts demonstrate that each of the defendants is entitled to judgment as a matter of law.


B.  Defendants Sweeney, Shannon-Sharpe, Gates, Sutter, Lund and Hammer

Plaintiff contends that defendants and Special Needs Committee members Sweeney, Shannon-Sharpe, Gates, Sutter, Lund and Hammer were deliberately indifferent to plaintiff's medical needs by refusing to allow him to purchase and order shoes from a non-approved vendor.  Plaintiff asserts that the committee members had the authority and the discretion to grant his requests, that they knew about the seriousness of his foot condition and that they knew that he needed shoes of a certain size to address that condition.  Therefore, plaintiff argues, it was obvious to defendants that if they denied plaintiff's requests, he risked suffering serious physical harm and needless pain in his feet.  Plt.'s Opp. Br., dkt. #45, at 5-7.

I am granting summary judgment as to these defendants for two reasons.  First, the evidence plaintiff has put forth does not show that he actually needed the particular

treatment that he requested, namely size 12.5 shoes. Second, the evidence shows that prison staff was making good-faith efforts to find a solution that would address plaintiff's legitimate medical needs, and that the committee took those efforts into account.

The Special Needs Committee denied plaintiff's requests to order personal shoes from a non-approved outside vendor on two occasions: on April 18, 2014, and on June 3, 2014. Dfts.' Reply to Plt.'s Resp. to Dfts.' PFOF, dkt. #52, ¶¶ 44-54. At the time of the first denial, plaintiff had recently rejected and refused to wear size 13 shoes that appeared to fit him. He had also just been approved for a consultation with an outside podiatry specialist at the University of Wisconsin, but had not yet had that appointment. Thus, as of April 18, 2014, the evidence shows that prison officials were still in the process of trying to assess and accommodate plaintiff's medical needs.

In his brief opposing summary judgment, plaintiff focuses almost entirely on the committee's second denial. Plt.'s Opp. Br., dkt. #45, at 5-7. It is not clear whether plaintiff intends to abandon any argument based on the first denial. In any event, I find that the initial April 18, 2014 decision to deny plaintiff's request did not constitute deliberate indifference in violation of plaintiff's Eighth Amendment rights because there is no evidence to show that the committee had any reason at that time to believe either that plaintiff had a particular medical need to order personal shoes from a non-approved outside vendor or that denying him that request would risk causing serious medical harm.

18

The committee's decision to deny plaintiff's request a second time, on June 3, 2014, took place about a month after Dr. Migon recommended that plaintiff be allowed to wear size 12.5EE shoes from a non-approved outside vendor.  Plaintiff contends that, in the face of this recommendation from an independent, professional foot specialist, the committee's June 3, 2014 decision must be characterized as deliberate indifference to his medical needs. Plt.'s Opp. Br., dkt. #45, at 5-7.

In evaluating that decision, it is important to keep in mind the precise issue presented by this claim, which is whether plaintiff had a right under the Eighth Amendment to size 12.5 shoes.  Thus, plaintiff must show that the difference between size 12.5 shoes and all of the other shoes he received was significant enough to demonstrate that defendants were consciously disregarding his health by refusing to grant his specific request to order shoes from an unapproved outside vendor.

Plaintiff has failed to make that showing.  Plaintiff's only medical evidence that he needed size 12.5 shoes is Dr. Migon's recommendation.  Plaintiff does not cite any evidence suggesting that Dr. Migon made that recommendation for any reason other than because plaintiff had requested that size in his consultation.  Dr. Migon's notes do not indicate that she measured plaintiff's feet or made any independent medical determination about the size that he should wear.  Dkt. #42-1, at 44.  Thus, it is questionable whether plaintiff can rely

19

on the recommendation to show that size 12.5 shoes were the most appropriate size for him, let alone that shoes in this size were medically necessary.

Even if I assume that Dr. Migon made her shoe size recommendation for medical reasons after undertaking an independent foot assessment, that recommendation alone cannot show that plaintiff's Eighth Amendment rights were violated.  Dr. Migon later clarified her recommendation to state that plaintiff "can wear a size 13 shoe."  This demonstrates that, even if Dr. Migon believed that size 12.5 shoes were medically appropriate, she believed that size 13 shoes were medically appropriate as well.  Without evidence to show that size 12.5 shoes were medically necessary, plaintiff's claim fails.

Moreover, it is undisputed that prison officials went to great efforts to accommodate plaintiff's foot condition by purchasing (at state expense) several pairs of shoes in different sizes and widths, in a good-faith attempt to find a solution that was both medically appropriate and consistent with the prison's security concerns.  The Special Needs Committee members did not simply ignore plaintiff's request for help; they informed plaintiff that health care staff would continue searching for an appropriate shoe, which is what staff did, ordering four new pairs for plaintiff.  Under the circumstances, defendants were not required to do more.

Policies limiting the ordering of items from outside vendors are common in prisons for the obvious reason that officials want to minimize the risk of contraband coming into the

20

prison from unfamiliar sources.  E.g., Howard v. Bartow, 131 F. Supp. 3d 789, 795 (E.D. Wis. 2015) ("If there were no restrictions placed on the vendors from whom an inmate could order items, it would consume significant time and resources for security staff to process each item to ensure it met security requirements.  Security-related concerns specific to shoes include that the shoe could contain a pocket in the sole, metal or hidden zippers, all of which could pose a security risk.").  If plaintiff could demonstrate that size 12.5 shoes were medically necessary or even that they would provide significantly greater pain relief than the other shoes the prison provided, perhaps the members of the committee would have needed to consider making an exception to the rule.

However, plaintiff has not provided such evidence.  The record does not support his argument that there are disputed facts "based on credibility issues as to the pain and if the shoes would have made a difference as to [plaintiff] needing surgery now as well as if the wrong size shoe exacerbated the problems," Plt.'s Opp. Br., dkt. #45, at 5.  In fact, the only evidence plaintiff has offered to support his claim is his own belief that he needed size 12.5 shoes and that they would have made a difference.  Because plaintiff's subjective belief about what is necessary in order to adequately treat him does not constitute evidence of a medical necessity, defendants are entitled to summary judgment on this claim.  See, e.g., Knight v. Wiseman, 590 F.3d 458, 466-67 (7th Cir. 2009); Ciarpaglini v. Saini, 352 F.3d 328, 331 (7th Cir. 2003).

Because there is insufficient evidence from which a reasonable jury could find deliberate indifference to plaintiff's medical needs, defendants Sweeney, Shannon-Sharpe, Gates, Sutter, Lund and Hammer are entitled to summary judgment.

## C. Defendant Boughton

Plaintiff contends that as the prison warden and administrative officer in charge of the entire Boscobel facility, defendant Boughton can be held liable for failing to act to address plaintiff's medical needs, thereby violating his Eighth Amendment rights. Plt.'s Opp. Br., dkt. #45, at 7. Specifically, plaintiff alleges that once defendant Boughton was notified of the situation, "he was obligated to make sure that [plaintiff] got the correct shoes which was a size 12½EE like they told him." Id.

This claim fails for the same reason as the claim against the Special Needs Committee defendants, which is that plaintiff has not shown that he had a serious medical need for the specific accommodations he was requesting. Although the claim against defendant Boughton involves a later time period (from July 2014 to April 2015), plaintiff does not point to any additional evidence that he provided that would show that the warden should have reached a different conclusion from the committee regarding whether plaintiff had a medical need for a size 12.5EE shoe (or for any other particular shoe from an unapproved outside vendor).

22

The record shows that defendant Boughton considered plaintiff's complaints about treatment for his foot pain on four occasions.  First, in July 2014, defendant Boughton reviewed a grievance in which plaintiff complained about his pain medications.  Because that grievance did not relate to plaintiff's shoes, it is outside the scope of this case and I need not consider it.  Around the same time, defendant Boughton also asked about what shoes plaintiff was provided, and was informed that plaintiff had accepted size 13 shoes, which according to the revised recommendation from Dr. Migon, were medically appropriate.

Second, defendant Boughton reviewed a grievance in August 2014 in which plaintiff said that he wanted "athletic type shoes."  However, plaintiff did not explain in his grievance or his summary judgment submissions why those shoes were medically necessary, how they differed from the ones he had or why the shoes he had were inadequate.  As a result, defendant Boughton would not have had any reason to grant the request or to believe that plaintiff was at risk of suffering serious medical harm if his request were denied.

Third, in January 2015, Boughton reviewed a letter in which plaintiff asked to order shoes from an unapproved vendor.  Plaintiff has no evidence that he provided any new support for his request in that letter, so as to have put Boughton on notice that plaintiff was not receiving appropriate treatment.

Finally, in March 2015, Boughton reviewed a grievance in which plaintiff complained about the delay in receiving orthotic shoes and his inability to purchase shoes from an

23

unapproved vendor.  With respect to the delay, plaintiff does not cite any evidence that Boughton caused the delay or could have done anything to shorten it.  With respect to the request to purchase shoes from an unapproved vendor, it would have made little sense to grant that request after custom shoes and orthotics had been ordered for plaintiff.  Plaintiff identifies no reason to believe that whatever shoes he could have purchased on his own would have been superior to the shoes that were made specially for him.

In sum, the evidence does not support an inference that defendant Boughton acted unreasonably, let alone that he acted "blatantly inappropriate[ly]" by consciously disregarding a serious medical need of plaintiff's.  Pyles, 771 F.3d at 412.  On this record, therefore, no reasonable jury could find that defendant Boughton acted with deliberate indifference to plaintiff's Eighth Amendment rights.

## D.  Conclusion

Taking the summary judgment record as a whole and drawing all reasonable inferences in favor of plaintiff, I conclude that prison officials were attentive to plaintiff's medical condition and needs.  Over a nearly two-year period from May 2013 to April 2015, plaintiff complained to prison officials about his bunions and foot pain numerous times, filing more than half a dozen official grievances.  Staff investigated and responded each time, taking various remedial actions.  They arranged for plaintiff to have several medical

24

appointments with Dr. Cox in the Health Services Unit and with outside podiatry specialists at the University of Wisconsin (one appointment with Dr. Migon and two appointments with Dr. Smith).  They provided plaintiff at least eight different pairs of special shoes, of varying sizes and widths, and investigated other options as well, in an attempt to find plaintiff shoes that would better address his bunions and foot pain.  They informed plaintiff that he was free to purchase his own personal shoes from the approved vendor catalog.  They also made him an appointment with Dr. Burke at Aljan to be fitted with custom shoes and orthotics.  This is important context within which to view defendants' refusal to allow plaintiff to order personal shoes from a non-approved outside vendor.

Warden Boughton and the Special Needs Committee defendants may not have given plaintiff the responses or the exact shoe options that he wanted, but under the applicable standards, this does not amount to an Eighth Amendment violation.  Because plaintiff has not shown that there are any genuine disputes of material fact and the record contains insufficient evidence from which a reasonable jury could find deliberate indifference to a serious medical need, defendants are entitled to summary judgment.

E.  Motion to Stay

On October 10, 2016, defendants filed a motion to stay the trial date and related deadlines in this case pending the court's decision on defendants' motion for summary

25

judgment. Dkt. #55. Because this order obviates the need for a trial, the motion to stay is now moot.

ORDER

IT IS ORDERED that

1.      The motion for summary judgment filed by defendants Lori Alsum, Anthony Broadbent, William Brown, Welcome Rose, Jerry Sweeney, Joni Shannon-Sharpe, Shirley Gates, Carrie Sutter, Kelsey Lund, Leo Hammer and Gary Boughton, dkt. #31, is GRANTED.

2.      Defendants' motion to stay, dkt. #55, is DENIED as moot.

3.      The clerk of court is directed to enter judgment in favor of defendants and to close this case.

Entered this 2d day of November, 2016.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge

26